Eugene M. PETERSON,
et al., Appellants,

v.

### DISTRICT OF COLUMBIA LOTTERY AND CHARITABLE GAMES CONTROL BOARD, Appellee.

No. 95–CV–165.

District of Columbia Court of Appeals.

Argued Feb. 14, 1996.
Decided April 4, 1996.

---

David R. Fontaine, with whom Joe R. Caldwell was on the brief, Washington, DC, for appellants.

Lutz Alexander Prager, Assistant Deputy Corporation Counsel, with whom Charles F.C. Ruff, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee.

Before TERRY and FARRELL, Associate Judges, and BELSON, Senior Judge.

FARRELL, Associate Judge:

In November 1986, appellant Peterson won $1,050,000.00 in the D.C. Lucky Lotto Game, payable in twenty annual installments. In 1993 he contracted with appellant Stone

Street Capital, Inc. (Stone Street) for assignment of his future payments in return for a present-value lump sum. The contract was contingent on the assignment being honored by the District of Columbia Lottery and Charitable Games Control Board (the Board), whereupon future payments would be made directly to Stone Street. The Board refused to honor the assignment, relying upon its regulations. This appeal requires us to decide whether either of two regulations, one in effect in 1986, the other adopted by the Board in 1992, bars Peterson's assignment of his winnings. We hold that neither does, and we reverse the trial court's refusal to grant declaratory relief to that effect.

## I. The Regulations

Peterson's winning lottery ticket carried the inscription that "[a]ll tickets, transactions, drawings, players and prizes are subject to the Rules and Regulations of the D.C. Lottery and Charitable Games Control Board." Board regulations in effect in 1986 provided that a ticket is "owned by the physical possessor ... until a name is placed on the back of the ticket," that only one name may appear on the back of the ticket, and that once a name is placed there, the person bearing that name "shall be the owner of the ticket and shall be entitled to the prize." 29 D.C.Reg. 2212, §§ 603–603.3 (1982). Payment to someone other than the owner was expressly permitted if the owner was a minor or incompetent, or had died. *Id.*, §§ 701.1–703.2. A regulation further declared that "Board members and employees shall be discharged of all liability relating to prize payment upon payment of a prize to the owner of a winning Lotto game ticket." 31 D.C.Reg.1986, § 1136.1 (1984); *see also* 29 D.C.Reg. 2212, § 700.1 (1982). In 1992, the Board amended the regulations by providing that "[n]o rights of any person to a prize or a portion of a prize shall be assignable." 39 D.C.Reg. 7447, § 607.1 (1992).

## II. The Proceedings

After the Board informed Stone Street's counsel that it would not honor the Peterson assignment, appellants brought suit for declaratory and injunctive relief.[1] At trial on the merits, Carolyn Lewis, a former chairwoman of the Board, testified that its practice had been not to permit assignment of lottery prizes even before the 1992 amendment of the regulations. Ms. Lewis and Robert Reid, the Board's chief financial officer, stated that the Board's position on assignability was based upon the 1982 regulations which specified that payments were to be made to the "owner." Board witnesses also testified that assignments would create administrative burdens and that unregulated assignments could expose all lottery winners to immediate tax liability under the IRS's "constructive receipt" doctrine.

The trial judge denied appellants relief. She rejected the Board's argument that permitting the assignment would expose the Board to a material increase in administrative burdens. She concluded, however, that the language on the lottery ticket subjected Peterson "at all times" to the rules and regulations of the Board, including amendments and rules issued after he won the lottery. Moreover, application of the 1992 rule to Peterson, she stated, "is not a question of retroactivity since the Board does not seek to apply the subject section [39 D.C.Reg. 7447, § 607.1] to prohibit assignments occurring before the effective date of the 'anti-assignment' provision, but rather has applied it prospectively to ... all lottery winners ... who would seek to assign their winnings after the effective date of the enacted prohibiting rule."

## III. Discussion

■■■■ It is well settled that a lottery winner's entitlement to a prize is governed by the principles of contract law. *See, e.g., Haynes v. Department of the Lottery,* 630 So.2d 1177, 1179 (Fla.Dist.Ct.App.), *review denied,* 642 So.2d 746 (Fla.1994); *Parsons v. South Dakota Lottery Comm'n,* 504 N.W.2d 593, 597 (S.D.1993); *Thao v. Control Data Corp.,* 57 Wash.App. 802, 790 P.2d 1239, 1241

---

1. Appellants initially brought the suit in the United States District Court but then dismissed it in favor of suit in the Superior Court.

(1990); *Valente v. Rhode Island Lottery Comm'n*, 544 A.2d 586, 589 (R.I.1988) (citing additional cases). This court has held that "[g]enerally, in the absence of a provision *expressly* incorporating future amendments to a statute, the parties [to a contract] will not be bound by such changes." *Johnson v. Fairfax Village Condominium IV Unit Owners Ass'n*, 548 A.2d 87, 92 (D.C.1988) (emphasis added) (citing 3 CORBIN ON CONTRACTS § 51, at 202 (1963)). *See also Ball, Ball & Brosamer, Inc. v. Martin*, 800 F.Supp. 967, 972 (D.D.C.1992) ("Courts may not construe an agreement to be modified by subsequent changes in the law unless there is a clear expression in the contract that this is the intention of the parties"), *vacated on other grounds*, 306 U.S.App.D.C. 339, 24 F.3d 1447 (1994).

■ Applying these principles, we cannot agree with the trial judge that the language on the lottery ticket—containing the terms of Peterson's contract—revealed a clear intention of the parties to be bound by future changes in the regulations. Indeed, the Board did not take that position in the trial court and does not do so on appeal. "The court is not at liberty ... to insert words which the parties have not made use of." *Harrison v. Fortlage*, 161 U.S. 57, 63, 16 S.Ct. 488, 489, 40 L.Ed. 616 (1896). By implicitly inserting the words "as may be amended from time to time" into the agreement, the trial court violated this maxim.

The Board instead proceeds on two fronts in its argument. It first contends that the 1982 regulations, in effect in 1986, required the Board not to honor assignments. It argues, in any case, that the 1992 amendment prevents assignments of all future prize payments while not disturbing Peterson's assumed right to assign earlier payments. The trial court disagreed with the Board on the first point but agreed with it on the second. We consider the arguments in turn.

## A.

■ The government's reading of the 1982 regulations must be tested against the rule that

[i]n general, all contractual rights may be assigned, including the right to sue for enforcement of a claim. The right to assign is presumed, based upon principles of unhampered transferability of property rights and of business convenience. The effectiveness of an assignment does not normally depend upon the consent of the obligor unless the rights to be assigned involve the performance of unique personal services.

*Flack v. Laster*, 417 A.2d 393, 399 (D.C.1980) (internal citations and footnotes omitted); *accord, District of Columbia v. Thomas Funding Corp.*, 593 A.2d 1030, 1033 (D.C.1991). Unless a contract contains "clear, unambiguous language" prohibiting an assignment, courts generally do not honor attempts to restrict the right to assign freely. *Flack*, 417 A.2d at 399.

■ The District concedes that the regulations in effect in 1986 contained no express prohibition on voluntary assignment of winnings. Moreover, the 1992 amendment demonstrates that the Board itself did not regard the 1982 regulations as "clear[ly]" and "unambiguous[ly]" prohibiting assignments, else the change would have been unnecessary. The District relies nonetheless on the language in the regulations discharging the Board of all liability "upon payment of a prize to *the owner* as described in section 603" (emphasis added), in turn defined as "the person whose name appears [on the back of the ticket]." But while this language may be read to express an intent to bar assignments, it may also express no more than "a direction on how payment is to be made," *Lemieux v. Tri–State Lotto Comm'n*, —— Vt. ——, 666 A.2d 1170, 1174 (Vt.1995), conveying the lesser intent that only a single winner (or successor in interest) may claim a prize. As a putative ban on voluntary assignments,[2] the language is too ambiguous to overcome the presumption in our decisions favoring the free assignment of contracts.

■ Contending that this is not an ordinary contracts case because of the presence

---

2. That the regulations explicitly provided for *involuntary* assignments in the case of death, minority or incompetency adds no weight to the argument that voluntary assignments were being prohibited.

of a government agency, the District further points to evidence at trial of what it terms the Board's "unfailing[ ] interpret[ation of] its 1982 regulations not to require it to pay a prize or installment to anyone other than the person who signed the winning ticket." It urges us to give this interpretation the deference normally accorded an agency's long-standing interpretation of its regulations. *See Dankman v. District of Columbia Bd. of Elections,* 443 A.2d 507, 514 (D.C.1981) (en banc). The difficulty with this position is twofold. First, we deal here with the Board as a contracting party. When the government enters into contracts with private individuals, "its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). Although the District relies on cases such as *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (courts give controlling weight to agency's reasonable interpretation of its own regulations), it has been cogently stated that "neither the language nor the reasoning of those cases suggests they require similar deference to the agency's interpretation of a contract that it makes with an outside party." *Meadow Green–Wildcat Corp. v. Hathaway,* 936 F.2d 601, 605 (1st Cir.1991) (Breyer, J.); *see also id.* at 604 ("[I]t would seem surprising and unfair if the terms of this document, without so stating, bind the [private individual] but leave the other party [the agency] . . . free to interpret those same terms as it wishes (limited only by the bounds of 'reasonableness' ")); *National Fuel Gas Supply Corp. v. F.E.R.C.,* 258 U.S.App.D.C. 374, 382, 811 F.2d 1563, 1571 (1987) ("[I]f the agency itself were an interested party to the agreement, deference might lead a court to endorse self-serving views that an agency might offer in a post hoc reinterpretation of its contract"). The Board, of course, is more than an ordinary party to a contract. Gambling is a highly regulated activity in this jurisdiction, and the Board is charged with primary responsibility for regulating the lottery as an exception to the general ban against gambling in the District of Columbia. *See, e.g.,* D.C.Code §§ 22–1516 to –1518 (1989). Nevertheless, the lottery was legalized as a measure to raise revenue, *id.* § 22–1516, and the Board's ability through regulations to define unilaterally the terms of the contract with ticket buyers ill equips it to claim the benefit of a merely permissible reading of an ambiguous regulation.[3]

Moreover, the "unfailing" or uniform interpretation the District cites is less than apparent in the record. The trial court found this to consist largely of "some undisclosed, undated conversations with vendors and other such people over the phone about whether or not they could accept lottery payments."[4] The court noted the absence of any documentary or tape-recorded evidence of the Board's policy, including the lack of written guidelines. A letter from the Board's counsel cited by the District merely states that the Board's practice (except in the case of death) had been to "permit payment to no other person [than the owner of the winning ticket] *except under court order* " (emphasis added). As appellants point out, a customary practice in other states with regulations similar to the District's is for a court to approve assignment upon application and after considering the regularity of the particular assignment. In effect that is what appellants sought here by declaratory action, and until this litigation, it was not plain that the Board would have regarded such court approval as insufficient to justify approval.

---

3. The District's assertion that "public policy" counsels against applying the normal rule of free assignability of contracts in this context is unpersuasive. Essentially, the government relies on arguments of administrative burden and potential adverse tax consequences that were rejected by the trial court after hearing the evidence. *See* D.C.Code § 17–305(a) (1989). At the same time, no one disputes that the Board could take those arguments into account in prohibiting assignment of post–1992 prizes. We observe, in passing, that the record does not support the District's footnote claim that it was denied an adequate opportunity for discovery and case preparation.

4. The Board staff, according to Ms. Lewis, also had internal discussions "about the issue of who would be paid[,] and our intent and our expression, *our conversations* were that the winner, and only the winner would be paid" (emphasis added).

We hold that the 1982 regulations did not prohibit the assignment of Peterson's winnings.

### B.

■ We also reject the District's argument that the 1992 anti-assignment regulation bars Peterson's assignment of his 1986 winnings. First, the regulation itself reveals no clear intent to cover prizes won before its effective date. The District points out that it makes unassignable the "rights of any person to a prize *or portion* of a prize" (emphasis added), suggesting that this includes future payments on pre–1992 prizes. But the italicized words just as reasonably may be intended to cover a person who wins the lottery after the effective date of the rule but seeks to assign the remaining portion of the prize years later, as Peterson did in this case.

Moreover, the District's reading of the regulation would raise a substantial question of the Board's authority. While the Board's power to adopt regulations is unchallenged, *see* D.C.Code §§ 2–2506(a), –2521 (1994), "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by [the legislature] in express terms." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 472, 102 L.Ed.2d 493 (1988). Nothing in the Board's enabling language gives it the express power to regulate retroactively. The District acknowledges this problem, because it argues that application of the 1992 regulation to Peterson presents no real issue of retroactivity. As applied to the assignment of his post–1992 installments, the District says this is a case of " 'secondary' retroactivity" within

the meaning of Justice Scalia's concurrence in *Bowen.* Justice Scalia reasoned that a rule may be found to have "exclusively future effect" even though there is some reasonable secondary retroactive effect on past transactions. *Id.* at 219–20, 109 S.Ct. at 477–78.[5] At the same time, he explained that "this 'reasonableness' inquiry" could not be extended "to purported rules that not merely affect past transactions but change what was the law in the past." *Id.* at 220, 109 S.Ct. at 478.

Statutory retroactivity has long troubled the Supreme Court, but recently the Court dealt authoritatively with the issue in *Landgraf v. USI Film Prods.,* — U.S. —, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).[6] The Court stated that in each such case the question is "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at —, 114 S.Ct. at 1499. Included in this is whether "it would impair rights a party possessed when he acted. . . ." *Id.* at —, 114 S.Ct. at 1505. The Court earlier cited approvingly Justice Story's "functional conception[ ]" of legislative retroactivity as embracing " 'all statutes, which, though operating only from their passage, affect vested rights and past transactions.' " *Id.* at —, 114 S.Ct. at 1499 (citation omitted).[7] There seems to us no question that when Peterson won his prize in 1986 he acquired the right to assign his winnings in keeping with the normal rule of free assignability of contracts. Thus, if the 1992 regulation barred that assignment, it would operate retroactively by "attach[ing] new legal consequences to events completed before its [adoption]." *Landgraf,* — U.S. at —, 114 S.Ct. at 1499. And it would do so despite the "traditional presumption" reaffirmed by *Landgraf*

---

5. The example he gave was of a Treasury Department rule assessing future income tax liability by taxing income from certain trusts that had previously not been considered taxable.

6. Though not strictly bound to do so, this Court has consistently looked to Supreme Court law for guidance in this area. *See, e.g., Tenants of 2301 E Street v. District of Columbia Rental Housing Comm'n,* 580 A.2d 622, 628 (D.C.1990).

7. "The largest category of cases in which we have applied the presumption against statutory

retroactivity has involved new provisions affecting *contractual or property rights,* matters in which predictability and stability are of prime importance." *Landgraf,* — U.S. at —, 114 S.Ct. at 1500 (emphasis added). The Court contrasted this and similar types of cases involving laws retroactively affecting substantive rights with its cases demonstrating that "[c]hanges in procedural rules" often raise no concerns of retroactivity though applied in suits arising before their enactment. *Id.* at —, 114 S.Ct. at 1502.

that a law does not operate retroactively "absent clear [legislative] intent favoring such a result," *id.* at ——, 114 S.Ct. at 1505—in our case, an intent both of the Board to embrace past contracts and of the legislature to authorize such rulemaking by the Board. *See Bowen, supra.* The fact that Peterson did not exercise his right until after 1992 does not change this result.

We therefore hold that the 1992 regulation does not prohibit Peterson's assignment of his future installments.[8] Nothing in that conclusion will prevent the Board, even as to pre–1992 winners, from employing procedures designed to insure the authenticity of an assignment and accurate identification of the assignee.

*Reversed.*

---

**8.** We accordingly have no need to consider appellants' constitutional arguments against application of the regulation to this assignment. *But see Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296–97, 76 L.Ed. 598 (1932) (court should interpret statute when possible so as to avoid significant constitutional issues).